**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

NICHOLAS BIRDSONG,

*Plaintiff,* **CASE NO.:**

v.

JACKSONVILLE JAGUARS, LLC

*Defendant.* /

# COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Nicholas Birdsong files this action against his former employer, Defendant Jacksonville Jaguars, LLC ("**Defendant**"), as follows:

## INTRODUCTION

1. Plaintiff is an African American man. He was an exceptional performer during his tenure with Defendant.

2. Despite this, Defendant's management targeted him because of his race and doubled down by retaliating against him after he opposed what he reasonably believed was Defendant's disparate treatment of Black employees and expressly complained about racial bias in the workplace. Specifically, after making such complaints he was scored as lacking in 'respect' and his 'ability to articulate' on his annual review.

3. Defendant promotes itself as a local advocate for racial equality. But when it comes to its own employees, it still applies different standards to its Black employees than its White ones.

4. This is an action for race discrimination and retaliation in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights of 1964 ("Title VII"), and the Florida Civil Rights Act ("FCRA").

**PARTIES, JURISDICTION AND VENUE**

5. Plaintiff is a resident of Duval County, Florida.

6. Defendant is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.

7. Plaintiff was an "employee" within the meaning of Title VII and the FCRA at all times relevant to this Complaint.

8. Defendant was an "employer" within the meaning of Title VII and the FCRA at all times relevant to this Complaint.

9. This Court has subject matter jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1981 and Title VII pursuant to 28 U.S.C. § 1331.

10. This Court has supplemental jurisdiction over Plaintiff's related claims under the FCRA pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

11. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business and continuously conducts substantial business within this District.

12. Venue is proper in this district because Defendant is subject to personal jurisdiction in this District and because the acts and omissions complained of herein occurred in this District. *See* 28 U.S.C. § 1391.

13. On or about September 23, 2025, Plaintiff timely filed a Charge of Discrimination alleging race discrimination and retaliation against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 510-2025-13360. This charge was dual-filed with the Florida Commission on Human Relations.

14. On June 10, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights to Sue authorizing Plaintiff to institute a civil action against Defendant.

## GENERAL ALLEGATIONS

15. Plaintiff is a Black man.

16. He began working as Defendant's Director of Digital and Social Media on or about February 16, 2021.

17. Plaintiff received multiple honors during his employment. He was chosen to participate in the NFL's Club Leadership Summit at NYU and was one of a select group of Defendant's employees chosen to meet NFL Commissioner Roger Goodell.

18. In Plaintiff's 2023 annual performance review, he received an average score of 4.8 out of 5, with "5–Outstanding" scores in Passion, Innovation, Dedication, and Empowerment. Plaintiff's manager described him as a "driving force" behind Defendant's digital and social-media success and a "key asset" to the organization.

19. On August 21, 2024, Chris Gargani, Vice President of Sales and Marketing and Plaintiff's direct supervisor, proposed addressing performance and behavioral concerns involving Charlie Jordan, a White Social Media Manager, through a less severe "Memo to File." Gargani also suggested that Ahmon Lott, a

Black Social Media Specialist, be placed on a more severe disciplinary performance improvement plan ("PIP").

20. Plaintiff objected to imposing different levels of discipline and advocated that Jordan and Lott be treated equally and evaluated under the same standards given the comparable seriousness of their conduct.

21. When Plaintiff later documented the grounds for placing Jordan on a PIP, Gargani questioned whether disciplining Jordan could be viewed as retaliatory and asked whether equivalent documentation had been prepared for Lott. Plaintiff again explained that the employees should be treated equally and judged individually based on their respective conduct.

22. Following Plaintiff's insistence that Jordan and Lott receive equal discipline, Gargani began subjecting Plaintiff to heightened scrutiny and different workplace expectations.

23. On September 24, 2024, Gargani stormed into Plaintiff's office and approached him in a physically intimidating and threatening manner. Gargani berated Plaintiff for a perceived act of disrespect, after Plaintiff asked Brette Sadler, a White Senior Director of Marketing, a question via a Microsoft Teams message regarding a request she had made of Plaintiff.

24. Despite feeling humiliated and disrespected in the face of Gargani's aggression, Plaintiff calmly responded and deescalated the situation. Plaintiff provided Ms. Sadler with the requested information on that same day.

25. For his 2024 end of year performance review, Gargani gave Plaintiff a 2.0/5 "Meets Expectations" rating, a substantial decline from the year before. Among other things, Gargani specifically criticized him in the "***Respect***" category due to the Teams message with Sadler, and his word choice and "***ability to articulate***" information.

26. Gargani began imposing new and subjective expectations on Plaintiff regarding dress, attendance, office presence, and camera use. Defendant did not consistently impose the same expectations on White employees, including Sadler.

27. In November 2024, Plaintiff submitted a formal rebuttal to his 2024 performance review conducted by Gargani to Jessica Jones, Senior Vice President of Defendant's Human Resources. In the rebuttal, Plaintiff disputed Gargani's criticisms, and identified unequal application of subjective workplace expectations.

28. On February 25, 2025, COO Chad Johnson informed Plaintiff that his rebuttal to his 2024 performance review would be shared with Gargani.

29. COO Johnson required Plaintiff to meet with him, Gargani, Sadler and Defendant's legal counsel to discuss vague complaints about Plaintiff's leadership. During the meeting, Plaintiff was accused of resisting collaboration with Sadler. When Plaintiff tried to clarify that he had demonstrated a willingness to collaborate, COO Johnson became combative and indicated that Plaintiff's employment was at risk.

30. After the meeting, COO Johnson generally instructed the meeting participants to treat each other respectfully. But the only concrete corrective

requirements he gave were directed at Plaintiff to repair his relationships with Gargani and Sadler.

31. On March 21, 2025, Defendant increased Plaintiff's annual salary by three percent and approved an additional Digital Operations Coordinator position for Plaintiff's department.

32. During the week of April 22, 2025, Defendant's social and digital media platforms were ranked No. 1 among all NFL clubs in social media total follower growth and total video views, and No. 2 in average interactions on TikTok.

33. On April 24, 2025, Defendant excluded Plaintiff from a critical NFL draft chat. Plaintiff had participated in similar chats during previous years and his attendance was necessary for Plaintiff to lead Defendant's real-time social and digital coverage of the NFL Draft.

34. Instead, Defendant included Plaintiff's White subordinate, Jennifer Garavaglia, Senior Digital Media Manager, in the chat instead.

35. Gargani subsequently admitted excluding Plaintiff and attempted to justify it with a distinction between "social" and "digital" responsibilities, even though Plaintiff's title was Director of Digital and Social Media and Garavaglia reported directly to Plaintiff.

36. After Plaintiff documented the exclusion via email, Gargani came into his office and told him not to send emails concerning such matters.

37. Defendant also permitted Plaintiff's White subordinates to bypass him and complain directly to his White superiors about the performance of Plaintiff's Black

subordinates, contrary to Defendant's established conflict-resolution protocol. Defendant's management repeatedly credited those complaints, thereby undermining Plaintiff's managerial authority and subjecting Black employees to heightened scrutiny.

38. For example, on April 25, 2025, Sadler told Plaintiff that three White employees on Plaintiff's team, including Jordan and Garavaglia, had complained about the work productivity of one of Plaintiff's Black subordinates.

39. On April 28, 2025, Plaintiff met with Sadler and expressly complained that Defendant was permitting racial bias within the department by crediting complaints from White employees, allowing White employees to undermine Plaintiff's authority, and subjecting Black employees to heightened scrutiny.

40. During the meeting with Sadler, Plaintiff contrasted Defendant's heightened scrutiny of Black employees with Defendant's failure to discipline or meaningfully address Jordan's conduct when he told Plaintiff's team to "suck it" during a workplace meeting.

41. Garavaglia informed Plaintiff that she had not initiated any complaint concerning the Black subordinate's performance. Instead, Sadler had contacted Garavaglia concerning complaints reportedly made by other employees.

42. Garavaglia told Plaintiff that the Black subordinate had worked hard, performed his assigned responsibilities successfully, and produced work benefiting the digital-media operations Garavaglia supervised.

43. Despite receiving Plaintiff's express complaint of racial bias, Defendant neither investigated his complaint nor took corrective action before terminating him seven days later.

44. Defendant terminated Plaintiff on May 5, 2025.

45. During the May 5th termination meeting, COO Johnson told Plaintiff that Plaintiff and Defendant had experienced "six months of problems." That timeframe began around the time Plaintiff submitted his November 2024 rebuttal criticizing Gargani's favoritism, bullying, and inconsistent workplace expectations, and continued through Plaintiff's April 28, 2025 complaint of racial bias to Sadler.

46. During the termination meeting, Defendant's Executive Vice President and Chief Legal Officer, Megha Parekh, told Plaintiff that Defendant was terminating him because of the organization's desire for Plaintiff to "feel like you have the opportunity to grow and work with ***the people*** you like."

47. Before terminating Plaintiff, Defendant had never placed him on a performance improvement plan, issued him a formal written warning, or subjected him to any other formal discipline.

48. Defendant later asserted that it terminated Plaintiff because of a departmental restructuring and concerns about his performance, even though no restructuring was mentioned during the termination meeting. Plaintiff is unaware of any other employee in Defendant's Jacksonville marketing department whose position was eliminated as part of the alleged restructuring.

49. Defendant retained Jordan and promoted him following Plaintiff's termination.

## COUNT I – VIOLATION OF 42 U.S.C. § 1981 (RACE DISCRIMINATION)

50. Plaintiff repeats and realleges Paragraphs 1 through 49 as if fully set forth herein.

51. Plaintiff is Black and a member of a class protected by § 1981.

52. Plaintiff was qualified for his position and performed his job duties successfully throughout his employment.

53. Despite his successful performance, Defendant repeatedly discriminated against Plaintiff because of his race.

54. Defendant impaired Plaintiff's contractual employment relationship and interfered with his enjoyment of its benefits, privileges, terms, and conditions when Defendant failed to adequately address his concerns of disparate treatment because of his race and repeatedly targeted him after he made complaints about the same, which included undermining his management authority, applying subjective standards and increased scrutiny towards him and other Black employees that were not consistently applied to similarly situated employees outside of his class, excluding him from meetings in favor of his White subordinates, and ultimately resulted in Defendant terminating Plaintiff.

55. Defendant treated White employees more favorably under circumstances that were the same or materially similar, including by tolerating comparable or more serious workplace conduct without terminating their employment.

56. But for Plaintiff's race, Defendant would not have engaged in the same conduct.

57. By discriminating against Plaintiff because of his race, Defendant denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and were enjoyed by non-Black citizens, in violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981).

58. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, Defendant's failure to take corrective action in response to Plaintiff's complaints of race discrimination.

59. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

60. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

**COUNT II – VIOLATION OF 42 U.S.C. § 1981 (RETALIATION)**

61. Plaintiff repeats and realleges Paragraphs 1 through 49 as if fully set forth herein.

62. Section 1981 protects employees from retaliation for opposing race discrimination that interferes with contractual rights protected by § 1981.

63. Plaintiff engaged in protected activity when he expressly complained to Sadler that Defendant was fostering a racially discriminatory work environment by favoring White employees, permitting White employees to undermine his authority, and subjecting Black employees to heightened scrutiny.

64. Defendant subjected Plaintiff to materially adverse employment actions that would dissuade a reasonable employee from opposing unlawful discrimination, when it terminated him seven days after he expressed his complaint regarding race discrimination.

65. But for Plaintiff's complaints of discrimination, Defendant would not have terminated him.

66. By retaliating against Plaintiff because of his race and his protected activity, Defendant denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-Black citizens, in violation of Plaintiff's rights under the Civil Rights Act of 1866 (42 U.S.C. § 1981).

67. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly and directly countenanced or approved of the retaliation against Plaintiff.

68. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

69. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

**COUNT III – VIOLATION OF TITLE VII (RACE DISCRIMINATION)**

70. Plaintiff realleges and incorporates paragraphs 1 through 49 as if fully set forth herein.

71. Plaintiff is Black and therefore a member of a protected class under Title VII.

72. Plaintiff was qualified for his position and performed his job duties successfully.

73. Defendant subjected Plaintiff to adverse actions because of race when it failed to adequately address his concerns of disparate treatment because of his race and repeatedly targeted him after he made complaints about the same, which included undermining his management authority, applying subjective standards and increased scrutiny towards him and other Black employees that were not consistently applied to similarly situated employees outside of his class, excluding him from meetings in favor of his White subordinates, and ultimately resulted in Defendant's decision to terminate Plaintiff. Each action caused Plaintiff harm concerning an identifiable term, condition, or privilege of his employment.

74. Plaintiff's race was a motivating factor to Defendant's decisions to alter the terms, conditions, and privileges of his employment and to terminate him.

75. Alternatively, Defendant would not have subjected Plaintiff to these adverse employment actions or terminated him but for his race.

76. Defendant's asserted explanations for Plaintiff's termination are false and a pretext for discrimination.

77. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of career opportunities, emotional distress, humiliation, inconvenience, reputational injury, and other compensable damages.

78. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

**COUNT IV – VIOLATION OF TITLE VII (RETALIATION)**

79. Plaintiff repeats and realleges Paragraphs 1 through 49 as if fully set forth herein.

80. Title VII prohibits an employer from retaliating against an employee because the employee opposed an employment practice made unlawful by Title VII.

81. Plaintiff engaged in protected activity when he expressly complained to that Defendant was fostering a racially discriminatory work environment by favoring White employees, permitting White employees to undermine his authority, and subjecting Black employees to heightened scrutiny.

82. Defendant subjected Plaintiff to materially adverse employment action that would dissuade a reasonable employee from opposing unlawful discrimination by terminating his employment.

83. But for Plaintiff's complaints of discrimination, Defendant would not have terminated him.

84. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly and directly countenanced or approved of the retaliation against Plaintiff.

85. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

86. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

**COUNT V – VIOLATION OF FCRA (DISCRIMINATION)**

87. Plaintiff realleges and incorporates paragraphs 1 through 49 as if fully set forth herein.

88. Plaintiff is Black and therefore a member of a protected class under the FCRA

89. Plaintiff was qualified for his position and performed his job duties successfully.

90. Defendant subjected Plaintiff to adverse actions because of race when it failed to adequately address his concerns of disparate treatment because of his race and repeatedly targeted him after he made complaints about the same, which included undermining his management authority, applying subjective standards and increased scrutiny towards him and other Black employees that were not consistently applied to similarly situated employees outside of his class, excluding him from meetings in favor of his White subordinates, and ultimately resulted in Defendant's decision to terminate

Plaintiff. Each challenged action caused Plaintiff harm concerning an identifiable term, condition, or privilege of his employment.

91. Plaintiff's race was a motivating factor to Defendant's decisions to alter the terms, conditions, and privileges of his employment and to terminate him.

92. Alternatively, Defendant would not have subjected Plaintiff to these adverse employment actions or terminated him but for his race.

93. Defendant's asserted explanations for Plaintiff's termination are false and a pretext for discrimination.

94. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of career opportunities, emotional distress, humiliation, inconvenience, reputational injury, and other compensable damages.

95. Defendant acted with malice or reckless indifference to Plaintiff's protected rights, entitling Plaintiff to punitive damages under the FCRA.

**COUNT VI – VIOLATION OF FCRA (RETALIATION)**

96. Plaintiff repeats and realleges Paragraphs 1 through 49 as if fully set forth herein.

97. The FCRA prohibits an employer from retaliating against an employee because the employee opposed an employment practice made unlawful by the FCRA.

98. Plaintiff engaged in protected activity when he expressly complained that Defendant was fostering a racially discriminatory work environment by favoring

White employees, permitting White employees to undermine his authority, and subjecting Black employees to heightened scrutiny.

99. Defendant subjected Plaintiff to materially adverse employment actions that would dissuade a reasonable employee from opposing unlawful discrimination, by terminating his employment.

100. But for Plaintiff's complaint of discrimination, Defendant would not have terminated him.

101. Defendant acted with malice or with reckless indifference to Plaintiff's protected rights. Defendant's management knowingly and directly countenanced or approved of the retaliation against Plaintiff.

102. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

103. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the FCRA.

## **REQUEST FOR RELIEF**

104. Plaintiff respectfully request that the Court enter judgment in his favor as follows:

A. Back pay, lost benefits, front pay, and other economic damages arising from Defendant's respective violations of 42 U.S.C. § 1981, Title VII, and the FCRA;

B. Compensatory damages for emotional distress, mental anguish, humiliation, inconvenience, loss of dignity, reputational injury, and other intangible

injuries from Defendant's respective violations of 42 U.S.C. § 1981, Title VII, and the FCRA;

C. Punitive damages to the fullest extent permitted under 42 U.S.C. § 1981, Title VII, and the FCRA;

D. Pre-judgment and post-judgment interest;

E. An award of costs and reasonable attorneys' fees; and

F. Such other relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 8, 2026

Respectfully submitted,

By: */s/ Christopher S. Prater*
Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com
**LEAD COUNSEL**

**Pollard PLLC**
500 East Broward Blvd., #950
Fort Lauderdale, FL 33394
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiff*